Mr. Craven Good morning, your honors. My name is David Craven. I'm with the law firm of Riggle & Craven. I'm here today on behalf of KYD and its matter against the United States. Good morning. We think that this matter, the facts in this a foreign producer that elected not to cooperate in a Department of Commerce proceeding. KYD put on record significant information, all of the information in its possession regarding its purchases from this company to try to demonstrate to the Commerce Department the nature of its, dumping margin that it should have applied to it had its foreign producer cooperated. Not withstanding this, the Department of Commerce applied adverse facts to KYD's foreign producer and also calculated an assessment margin for KYD, completely ignoring the cooperation that KYD had demonstrated to the department. When you say completely ignoring cooperation, I mean is it your position that even if you don't have all the information they need to make the calculations, that they should just give you the number you think is best because you cooperated? Not at all, your honor, but the department has for it the adverse facts provision. It also contains simple neutral facts available and our position is that an interested party such as KYD that fully cooperates should be entitled to receive a calculation based on neutral facts, not on adverse facts. Right, but you concede in your brief that you only had one neutral fact to give them and that was your purchase price. There were other factors that they didn't have, manufacturing and shipping costs, etc. What do you do with that? Well, your honor, that's why it's fact available. There are other facts available and the department has another calculations in Changzhou-Wujing Pine, for example, which was before this court a year and a half ago. So you're not arguing that the department can only look at your facts, they can look at other facts as well? Absolutely, your honor. And what's the problem with what they did? Well, they didn't look at our facts. They calculated, they completely ignored, I can't go into the prices, your honor, because the prices are confidential, but they completely ignored the price disparity, the significantly higher price. Even taking into account any kind of adjustment for shipping, my client's price disparity was significant. It's not really fair to say they completely ignored it on the second remand, is it? I mean, they didn't give you the number you wanted, but they factored those prices in. No, your honor, they didn't factor the prices in at all. What they factored in was the physical characteristics of the bag, and they picked the highest margin assigned to a bag which was similar to the types of bags we were bringing in, your honor. That's the Roan rule. That's the Roan rule, but we believe that they needed to look at the prices themselves, the data that we submitted, because otherwise, in this situation, where is the – the purpose of the adverse facts provision is to induce cooperation. And if this case stands the way it is, an importer will never again cooperate with the department voluntarily, because there is absolutely no incentive for him to do so. Well, I think you're overstating that, because isn't part of the issue that they can't get the foreign producer to cooperate, as was clearly the case here, by putting – you'll excuse the expression – the screws to the importer. That would encourage importers to not deal with recalcitrant suppliers. That would encourage importers to say, hey, if an issue comes up, you've got to cooperate, or I am not going to do business with you. What else could the government do in order to put some pressure on the recalcitrant suppliers, other than put the pressure on the importer? Give me an idea how you would organize the government's approach. Well, initially, the pressure is, in fact, also on the foreign producer here. The foreign producer has a very, very high deposit rate, but for the fact that KYD disclosed the fraudulent scheme they were using to avoid the continued application of the fraudulent deposit scheme. The exporter, foreign producer, is already stopped from selling into the market by the high rate applied to him. There is no reason to also bankrupt the innocent U.S. entity. The only thing that my client did was my client purchased product at a relatively high price, with the reasonable expectation that if dumping was calculated, he would receive a reasonable rate. He had no reason to suspect at the time that he purchased that he had purchased from a bad guy. And when he became aware he was a bad guy, he came to the government and he said, he's a bad guy. The domestic industry, as I've quoted many times in my brief, the domestic industry characterized their conduct as, KYD's submission is raising serious new issues, which were, from the petitioner's perspective, entirely unexpected. And then it goes on to discuss the confidential nature of what they found. In terms of the scheme, I'm not sure how punishing or not punishing KYD has any impact at all on the foreign producer. But part of it is your characterization. I mean, the rate is applied against the product, the product that goes in. Yes, the importer has to pay it if that's what they choose to import. But it's not really a penalty against the importer. It's a rate that applies to the product. Well, except that, Your Honor, it's calculated based upon the data supplied by interested parties. And the adverse facts provision does not distinguish between importer, foreign producer, domestic producer. The statute defines interested party, and it states what interested parties are. In a few places in the dumping law, it does limit interested party. It says interested, for example, in 1671 AB 4B, it says, the administrating authority shall not accept any unsolicited oral or written communication from any party other than an interested party described in 1677 9C D, E, F, and G. So it expressly limited A, B, and C. But in the adverse facts provision, the AFA provision, it simply says interested party. It doesn't limit interested party or define interested party as a subset of the statutory definition of interested party. So in this case, tell us just precisely what you think should have been considered. I think the price data of KYB should have been considered. For example, the fact available here could well have been the highest rate assigned, the highest average rate assigned to one of the two cooperative respondents, in that the price data shows that every price that KYB paid, the prices were higher than those prices that the other parties paid and received a rate of either 8% or 34%, depending on which of the two mandatory respondents. So you want to get the same rate as the cooperative respondents when your exporters didn't cooperate at all? Your Honor, I perfectly – at this point, the only person this rate would apply to would be KYB. The foreign producer has gone on and continued to engage in different schemes and machinations, and there have been further reviews. All the entries are liquidated except for KYB's. The effect of this, the only person affected by this decision at this point is KYB. Well, you're saying the only person that would be affected by this case, but that doesn't mean that if we issue a decision that says that whenever the importer cooperates, you've got to give them the benefit of – as if they were dealing with a different exporter. That has a pretty broad clause, doesn't it? I think, though, that initially there are very unique facts in this case. The cooperation here was extraordinary, and I'm not sure why we're trying to dissuade the cooperation of importers. Here you have an importer that provided information which is extraordinary. This is not the kind of information that has been historically provided by importers. You've got a little problem, Mr. Craven, with the facts, because the facts that we deal with are the facts found by the trial judge. Let me point out to you a couple of things that the trial judges in this case said. After the first remand, the court remanded, concluding that 19 U.S. Code 16, required commerce to either consider KYB's information or explain why it declined to do so. Then, in response, commerce filed its first remand. Then it went back for the second remand. In its second remand results – and this is from the court's opinion – in its second remand results, the – this is Judge Polk – in its second remand results, the department reviewed KYB's submitted data and selected an AFA rate of 94.62 percent. Are you arguing that that is an erroneous factual conclusion? Yes, Your Honor, because the remand determination says they didn't review the price data. They reviewed simply the nature of the goods. That isn't what this says. I'm aware of that, Your Honor. I'm also aware that you are entitled to engage in a de novo review of certain – of the – No, we don't do de novo review of facts. If there's substantial evidence in the record, we affirm. No. Right? That's our standard of review. That is your standard of review, Your Honor, but I don't believe there's substantial evidence in the record of this either, Your Honor. Despite what Judge Polk expressly found? Yes, Your Honor. Well, we'll hear from the government on that in due course on the floor. This might be a good time to hear from the government while this court is in line. Thank you, Your Honor. Okay. Mr. Sherdlove? Good morning, Your Honors. Mr. Sherdlove? Yes. Okay, proceed. Good morning. May it please the Court. Would you address the question we were just discussing rather than go back over the whole case? Absolutely, Your Honor. There absolutely is substantial evidence in the record to support both the trial court's finding and what the Department of Commerce did. As the Department of Commerce explained in its second remand determination, the price data that KYD submitted wasn't sufficient to calculate any sort of meaningful margin for KYD because Did Commerce look at the price data? Absolutely, Your Honor. But then chose not to put it into any calculation? That's right, because Commerce explained that the price data that KYD submitted wasn't sufficient to allow Commerce to calculate the normal value. It wasn't sufficient to allow it to make adjustments to U.S. price because that's what KYD's prices were. They were U.S. prices. But you looked at it, rejected it. The problem is that Judge Polk's fact-finding which says that you considered it. I mean, when Commerce considers certain data, it usually means that it's factoring it into its calculations. But what you're saying is that that's not really correct. You considered it in the more common sense of that word and then rejected it. We considered it and determined that we could not use it. Why? Because it was incomplete. Because the only thing that we had was the U.S. prices. We didn't know how those U.S. prices should be adjusted pursuant to statutory and regulatory provisions to adjust for freight, shipping, insurance, those kinds of things. We didn't know how to calculate normal value from the goods that were being sold and reported under these U.S. prices. So as a result, the prices themselves were meaningless. But U.S. prices were FOB Thailand, weren't they? That's correct, Your Honor. And as Commerce explained in its determination, even that wasn't sufficient because there were transport and shipment costs within Thailand, location of factories, that Commerce would have needed to factor in under its statutory and regulatory provisions and that it could not do so. And Commerce's determination that it didn't have sufficient evidence on the record was reasonable, given the fact that out of the three big criteria that Commerce needs to calculate margins, namely normal value, U.S. price, and various costs of shipping, we only had one. Well, given that, but isn't it fair, though, to argue that the price data, given how high it was, would have been at least indicative of the information and that you could have gone to other exporters and compared the prices that they charged based on their data? I don't think so, Your Honor. And the reason is because the other thing that Commerce did not have was the full scope of physical characteristics for KYD's products. As Commerce explained in its remand determination, it calculated normal value based on 13 physical characteristics of the subject bags. Now, KYD only reported eight. How many physical characteristics can a plastic bag have? Quite a number, Your Honor. It has to do with the size of the bag, how much ink coverage there is, the way handles are affixed, the volume of the bag. There's all sorts of these characteristics that are outlined in Commerce's remand determination on JA 1738. Commerce lists the characteristics. And of those, of the full panoply of 13 that Commerce determined it was going to use for these bags, KYD only reported eight. So what Commerce didn't know is it didn't know those other characteristics. Among the things that it did not know, it didn't know how much ink coverage the bag had and all those things. It simply was not reasonable to assume that those other five characteristics would have no effect on the normal value whatsoever. And Commerce did what was reasonable under the circumstances, which is it matched the physical characteristics as the trial court ordered, as the trial court directed in its second remand determination. It matched the physical characteristics that KYD did report to the physical characteristics of other sales made by cooperating respondents. And it chose the highest margin for the sale that matched all of those physical characteristics, all eight. And that was 94%. At the end of— If we agree with Mr. — hypothetically, if we were to agree with Mr. Craven, I take it the only ground that we could agree with him on is that it was given our standard of review over these cases. The only ground we could agree with him on is that it would have been arbitrary and capricious for Commerce to have discarded KYD's data from its calculations, that that would have been arbitrary. In other words, I don't think I'm asking you this. It doesn't appear to me that it's a question of substantial evidence in the record problem. It's more one of whether Commerce acted arbitrarily. Would you agree with that analysis? I'm trying to figure out exactly what the issue is on this particular matter. Your Honor, I think the issue is a question of substantial evidence. And the reason is because the premise of KYD's argument is that it is somehow entitled to a separate rate, to a rate separate from the AFA rate assigned to its uncooperative producers. Now, as this Court is aware, that argument has already been rejected. Yeah, I didn't think that was his argument. I thought his argument was in coming — you're right, there is some blending, unfortunately, of the issues. But I thought his argument was that you, Commerce, didn't even give due weight to our evidence of the rates because we had to pay high prices, and you didn't take that into account. Well, and I think that comes down to — that issue blends into the question of whether it's entitled to a separate rate and whether Commerce could have calculated a rate based upon the data that KYD submitted that was not based on adverse information. Right, and while there's a debate over whether Judge Wallach's opinion was correct, it's certainly what Judge Wallach contemplated in his remand order is that you could, in fact, use those numbers to aid your analysis in this particular case. That's right, Your Honor. What the Court in the second remand instruction contemplated was that Commerce would consider the U.S. data, the U.S. price data and the sales that KYD reported. That's what, according to the Court in KYD-3, the second remand instruction, that's what distinguished this case from KYD-1 and from Gallant Ocean. But that's exactly what Commerce did. What Commerce did was it looked at the data that KYD submitted. It determined that prices alone, the prices that KYD reported, weren't meaningful. They didn't tell Commerce enough because there was missing data, and so Commerce went further, investigated the actual — But you made that argument in the second remand, did you not, to Judge Wallach, that you didn't have to consider those because they were incomplete and it wouldn't give you all the information? And he did his scattershot approach and told you that, yes, they could be meaningful to your analysis, and you could factor these in even without having all the other peoples in part. That's right, Your Honor. Commerce made the argument that it was not required to do that sort of analysis because that was foreclosed under KYD-1 and under the statute. And Judge Wallach rejected that and then directed Commerce to consider this data, which Commerce had initially said was incomplete. But what Commerce was initially saying was the prices themselves were incomplete and we can't factor them in. And then after the court issued the second remand consideration, the second remand instructions, Commerce went back and it looked further. It looked beyond those prices. I mean, the court's remand instructions didn't say, Commerce, you must use these prices as they are given. The instruction was, Commerce, you are directed to consider this data. And after Commerce considered it, Judge Pogue affirmed. Judge Pogue – excuse me, the trial court looked at what Commerce did and it found that that was reasonable. And the evidence in the record fully supports that. The court has no further questions. I will see you the rest of my time. All right. We'll let Mr. Schneiderman have an extra 30 seconds. Thank you, Your Honor. May it please the court. This case is governed by KYD-1 and should be remanded to Commerce so that it can reinstate the 122 percent rate that was originally signed to Kingpac and KYD in the final results and that this court affirmed in KYD-1. I'd like to start just by clearing up one, I think, misconception here, which is this idea that KYD was a cooperative respondent and that Commerce should not have applied any sort of adverse inference or presumption against it. The Department of Commerce did not issue a questionnaire to KYD. It issued questionnaires to its Thai suppliers, the exporters. The adverse inference was drawn against Kingpac, which was the supplier, when it didn't respond, and their own presumption was drawn against the exporter. Kingpac, remember, had already been subject to a 122 percent deposit rate. When it made the decision not to respond to the questionnaire, it's reasonable for Commerce to infer that its margin was no less than the 122 percent rate that was already applicable, because if its margin were lower, the company presumably would have responded, and it didn't. That's their own presumption. It's not drawn against KYD, and it has nothing to do with KYD's level of cooperation. We understand all that, but let's get to the facts. So you said KYD 1 should control this, but the problem is that KYD 1 there, they didn't submit the domestic price data, and there they just made the general argument that they shouldn't be subjected to the exporter's margin. So here we have price data, and Judge Wallach looks at this and says, yes, you can use this price data. So it's a different set of facts. Well, Judge Wallach did a very complicated analysis. He actually compared KYD's prices to the prices of Maripac and Polyplast, whose margins – they were cooperative responders. Their margins raised from 9 to 33 percent, and he concluded that these prices are comparable, and he said, well, because of this, I find that they've rebutted their own presumption, that the 122 percent can't be relevant. The problem, however, is that KYD never made that argument to Commerce, and Commerce never had a chance to consider that analysis. KYD had said use our price to calculate a margin, never said use our price – compare our prices to the others and see if that rebuts their own presumption. Commerce looked at their data. They said, look, we can't calculate a margin from your data. It never did the analysis that Judge Wallach did, and it's actually a quite complicated analysis. It's not just a matter of eyeballing the data and concluding that the prices are similar. You have to – it involves very large databases and unit conversions and price adjustments, and quite frankly, the court, I think, botched the analysis. It started with the wrong databases. It failed to make certain price adjustments and unit conversions. None of this is disputed, by the way, by KYD. And as a conclusion – I mean, as a result, its conclusion that the prices are similar and that therefore KYD had rebutted this wrong presumption is invalid. And moreover, we think that the trade court erred even by conducting this analysis in the first place. Which raises the question in my mind, why didn't you move to appeal it at that point? Well, it had been remanded, and so it was an interlocutory decision. I don't think we could have appealed it at that point. But we did – we think that the court made some mistakes, and we raised that. We asked the court to reconsider its decision. The court didn't reconsider its decision, and we appealed once the final judgment came out. You say, though it's not clear Commerce does, that Commerce issued its third decision after the second remand under protest. But I don't see that stated in the government's brief, and they specifically state that they don't take a position on your appeal. Where in the record does it show that Commerce issued its decision under protest? It states in the second redetermination. It says under protest. It uses the words under protest. Okay, where in the record is that? Give me a cite. It's J.A. 1773. Okay. And so by conducting this analysis, we think that the trade court engaged in de novo fact-finding and failed to apply the substantial evidence standard and essentially usurped Commerce's role as the fact-finder. And it's actually a very similar thing that it did with the second – I'm sorry, the second exporter, which was Master Packaging, just briefly as background. KOD issued all of its purchase orders to Kingpac, its supplier, but noticed that towards the end of the review period, the merchandise began arriving on Master Packaging invoices, and what had happened is that Kingpac was – What the trade court said in KYD 3 is that at least with respect to those invoices on Master Packaging letterhead, you can't assign the 122 percent rate because of this court's Gallant Ocean decision. The court said Master Packaging is a new exporter. And again, the problem with that conclusion is that this is an argument that KYD never raised and that Commerce never had a chance to consider. And if it had had a chance to consider it, it very easily could have distinguished Master Packaging from the new exporter in Gallant Ocean because the new exporter in Gallant Ocean was a relatively innocent, naive exporter. There was no reason to infer from its failure to cooperate that it was hiding a high margin, which stands really in stark contrast to the exporter's behavior in this case. Again, Commerce was deprived of an opportunity even to consider these factors, and the court usurped its role as the fact finder. So again, we think it should be remanded to reinstate the 122 percent rate. Before you sit down, I want to ask you a question about the waiver argument as it relates to the Eighth Amendment because you didn't get a chance to respond to what was said in the reply, and that is that if you require reassertion of global issues, such as the constitutionality of ever using an AFA rate against the importer, an innocent importer, that it effectively wipes out the purpose of the remand process, which is to continually narrow issues. And we've had many cases where cases come up here, and we consider everything that happened at every stage of the process. In fact, that's what you're asking us to do in your cross-appeal. So how do you respond to that argument? Well, it's a different issue. They had said that the 122 percent rate is so high that that is unconstitutional. When it goes back on remand and Commerce selects a lower rate, is that rate still so high that it's violated? But their argument was much broader, which is that any rate that uses AFA against an importer, a cooperating importer, is too high. Well, I'm not sure I read it that way. My understanding was that they felt that this particular rate – in other words, I don't think that they're objecting to the selection of some sort of AFA rate. I think they're saying that this particular rate was just too high to be corroborated. It's not reflected, they believe, of their commercial reality. I think I read it the way Judge O'Malley reads it, which is they think it is unfair, illegal, immoral, and not right for the AFA rate to be imposed on a pure and innocent importer. If that's their case, then what? Well, first of all, as I mentioned, AFA was not applied against KYD. So just on the merits, I think the argument is a loser. I don't think you have to reach the merits because I think it's procedurally barred, but I'm happy to talk about the merits. As I said, no adverse influence was drawn against KYD. The high rate that was ultimately assessed on them is just a function of how the statute works, and this was what the majority said in KYD 1, which is that the dumping margin is assigned to the exporter. If the exporter misbehaves, it's subject to a very high rate and the wrong presumption of relevance. The importer-specific assessment rate by statute is based on the dumping margin that's calculated to the exporter, and also by statute the importer is liable for paying those duties. And the majority realized that sometimes there are going to be instances where you have an unaffiliated importer who gets stuck with a bill sometimes when it's dealing with a supplier who turns out not to be cooperative and doesn't respond to the questionnaire, but having that liability in place is important because it furthers the statutory purpose of encouraging compliance by exporters, which are really the parties that commerce needs to cooperate in these proceedings. And if you had it any other way, you would undermine the dumping law because exporters could – all they'd have to do essentially is ship to unaffiliated importers, and they'd never have to cooperate with commerce, and they'd know that their entries would never be liquidated at a high adverse tax available rate. Any more questions? Any more questions? Thank you, Your Honor. Okay, thank you, Mr. Schneiderman. Mr. Craven. Do you want to address your Eighth Amendment argument, Mr. Craven? Well, Your Honor, I think that we briefed the Eighth Amendment argument and set forth why we believe it applies. I would simply note we're not challenging the remedial purpose of the dumping law. Our challenge goes to the specifics of the AFA provision and the reading that's being given to the AFA provision. When we hear that the purpose is to encourage compliance, I would point out that the statute does not distinguish between interested parties for the purposes of encouraging cooperation. It simply encourages cooperation. If we apply the reading that's being proposed that an importer can never provide information to overcome the Rome Poulenc or otherwise cooperate, we have not only not encouraged cooperation from the importer, the interested party, we have discouraged cooperation because there's absolutely nothing then that an importer can ever say that would ever be helpful. And in this case, in Petitioner's own words, the information provided by KYD will raise serious issues that were significant. And that information will never again come to the Commerce Department if this interpretation of the provision applies. But if that's the way the statutory scheme is set up, that's a policy determination that was made by Congress, not us. But that's not how the statutory scheme is set up. The AFA provision says the term interested party. It does not limit interested party applying to foreign producer. It says interested party, and interested party is defined in the statute, and the exceptions in the statute. Statute does sometimes limit interested party, not in this provision. Doesn't that cut the wrong way for your position? No. No, Your Honor, because it says adverse facts taken against the interested party that does not cooperate. Here we have adverse facts being taken against an interested party that did cooperate. There's no issue that KYD did not cooperate. We hear the Commerce Department say, well, the information was incomplete or we had questions. They didn't send any questionnaires, supplemental questionnaires to KYD to ask further information. They do send questionnaires to importers. They send questionnaires to foreign producers under the application of AFA. So it's arbitrary. It goes against the commerce practice, that commerce has a regularized practice of seeking information from many different parties. They didn't choose to ask in this case, but that doesn't mean that KYD still wasn't encouraged to cooperate. With respect to the Gallon Ocean argument, I would point out that Gallon Ocean— So your argument is this is an Eighth Amendment problem as applied, not— As applied, and there's a simple solution to this, which is apply it constitutionally and don't penalize KYD for its cooperation. And with regard to the Gallon Ocean, I would simply point out that Gallon Ocean was decided after the cases were briefed. So, of course, it would be difficult to have addressed Gallon Ocean in the briefing in that it came down, I believe, a matter of days before oral argument. I have nothing further, Your Honors. I appreciate you hearing this case today. Thank you very much. Thank you. Thank you, Mr. Craven. Thank you, Counsel. The case is taken into submission.